FILED
2011 Sep-22  PM 03:31
U.S. DISTRICT COURT
N.D. OF ALABAMA

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION**

| | | |
|---|---|---|
| **CAPSTONE BUILDING CORPORATION,** | } | |
| | } | |
| | } | |
| **Plaintiff,** | } | |
| | } | |
| **v.** | } | **Case No.: 2:08-CV-0513-RDP** |
| | } | |
| **AMERICAN MOTORISTS INSURANCE COMPANY,** | } | |
| | } | |
| | } | |
| **Defendant.** | } | |

| | | |
|---|---|---|
| **CAPSTONE DEVELOPMENT CORPORATION,** | } | |
| | } | |
| | } | |
| **Plaintiff,** | } | |
| | } | |
| **v.** | } | **Case No.: 2:08-CV-0874-RDP** |
| | } | |
| **AMERICAN MOTORISTS INSURANCE COMPANY,** | } | |
| | } | |
| | } | |
| **Defendant.** | } | |

**MEMORANDUM OPINION REGARDING CERTIFIED QUESTIONS**

Contemporaneously with this Memorandum Opinion, the court has entered an order certifying certain questions to the Supreme Court of Connecticut.  Set forth in this Memorandum Opinion is the procedural and factual background giving rise to those questions.

**I.      PROCEDURAL HISTORY**

These cases are consolidated actions involving insurance coverage issues related to the same construction project.  After consulting with the parties, the court bifurcated this case into two phases.  During Phase One, the parties litigated coverage issues and, in turn, Phase Two dealt with bad faith

issues.  Defendant sought summary judgment during both phases.  The court determined that there were issues of material fact as to the coverage issues, and before writing a formal opinion as to the bad faith claims, determined it would be appropriate to certify these questions to the Supreme Court of Connecticut.

## II.    FACTS[1]

### A.    Overview

This case concerns an insurance coverage dispute between Plaintiffs, Capstone Building Corporation ("CBC") and Capstone Development Corporation ("CDC"), and Defendant American Motorist Insurance Company ("AMICO").[2]  CBC and CDC agreed to construct residential units at the University of Connecticut (sometimes referred to as "the University" or "UCONN"), a non-party in this case.  Plaintiffs completed the project in 2001, but in or around 2004, the University discovered various deficiencies in the construction.  Pursuant to the building contract between Plaintiffs and the University, the University was required to participate in mediation before it could file suit.  Plaintiffs demanded that Defendant participate in the mediation with the University because, according to Plaintiffs, the University's claims triggered coverage under the commercial general liability policy (discussed more fully below), which Plaintiffs contend extended to them and

---

[1] The following facts are based upon the court's Rule 56 analysis in this case.  That is, they are the "summary judgment facts" in this case.  They may not be the actual facts or even the facts presented at trial.  Moreover, as many – if not virtually all – of Plaintiffs' facts as enumerated in their summary judgment submissions have not been challenged by AMICO (at least for purposes of Rule 56), for efficiency and ease of reference, the court has not provided a pinpoint cite to the record regarding all the facts, but has cited the briefs which contain those record cites.

[2] AMICO is the real party of interest here.  The insurer which made the relevant coverage determinations was Kemper Insurance Company.

their work under the construction agreement.  Defendant, on various grounds, denied that it had a duty to defend and further denied that it had any duty to participate in the mediation.

Incidental to these demands, Plaintiff CBC initiated a declaratory judgment action against Defendant, and Defendant initiated a declaratory judgment action against Plaintiff CDC.  Both cases proceeded in this court before separate judges and were litigated and concluded before this action was filed.  Both lawsuits were dismissed without prejudice on procedural grounds – one under Federal Rule of Civil Procedure 19 and the other because of a lack of ripeness.  Meanwhile, the University continued to insist that Plaintiffs mediate the dispute, and Plaintiffs continued to demand that Defendant participate in the mediation.  In the face of Defendant's assertion that coverage did not extend to the University's demands, Plaintiffs attended the mediation and ultimately negotiated a resolution of the University's claims.  Instead of the $26 million demanded by the University, each Defendant agreed to pay the University approximately $1 million.

## B.      The Building Contract

On April 11, 2000, Plaintiff CDC confirmed its bid submitted to the University of Connecticut for the coordination and supervision of the construction of a set of dormitories known as the Hilltop Apartments.  (Doc. #42-2 at 16).[3]  According to the bid, Plaintiff CDC agreed to construct the project at a cost not to exceed $39,325,000.  (Doc. #42-2 at 16).

On June 2, 2000, Plaintiff CDC, as developer, entered into an agreement with the University of Connecticut for coordinating and supervising the construction of the Hilltop Apartments.  (2:08-CV-874, Doc. #47-2 at 2).  According to the agreement, Plaintiff CDC would be responsible for all

---

[3] Unless otherwise noted, record cites correspond to those documents contained in the court's electronic docket in case 2:08-cv-513-RDP.

work that it knew to be in violation of "laws, statutes, ordinances, building codes, and rules and regulations." (2:08-CV-874 Doc. #47-2 at 24).  Additionally, Plaintiff CDC assumed responsibility for the "acts and omissions of [its] employees, subcontractors and their agents and employees and other persons . . . ." (2:08-CV-874 Doc. #47-2 at 5).  Relatedly, in July 2000, Plaintiff CBC entered into an agreement with Plaintiff CDC. (Doc. #42-2 at 17).  Pursuant to that agreement, Plaintiff CBC would serve as the contractor for the Hilltop Apartments project. (Doc. #47-2 at 2).  The construction contract between Plaintiff CDC and Plaintiff CBC incorporated the "Supplementary Conditions" contained in the agreement between Plaintiff CDC and the University of Connecticut. (Doc. #47-2 at 14).

The "Supplementary Conditions" governed, among other matters, resolution of disputes arising out of the project. (Doc. #47-2 at 58).  Specifically, the dispute resolution clause provided as follows:

### 10.9    Mediation of Claims

If a controversy or claim arises between the parties arising out of, or relating to this Contract or the breach thereof, the parties agree to use the following procedure prior to and as a precondition to either party pursuing any other available remedies, including arbitration or litigation:

1.    A meeting shall be held promptly between the parties, attended by individuals with decision-making authority regarding the dispute, to attempt in good faith to negotiate a resolution of the dispute.

2.    If, within 30 days after such meeting, the parties have not succeeded in negotiating a resolution of the dispute, they agree to submit the dispute to non-binding mediation in accordance with the Construction Industry Mediation Rules of the American Arbitration Association.

4

3.    The parties will jointly appoint a mutually acceptable mediator, seeking assistance in such regard from the American Arbitration Association if they have been unable to agree upon such appointment within 20 days from the conclusion of the negotiation period.

4.    The parties agree to participate in good faith in the mediation and negotiations related thereto for a period of 30 days. If the parties are not successful in resolving the dispute through the mediation, then the parties may pursue the other legal remedies available to them.

**10.10  Arbitration or Litigation of Claims**

Any controversy or claim arising out of or related to the Contract or the breach thereof which is not resolved through mediation . . . shall be subject to the provisions of Section 4-61 of the Connecticut General Statutes. The requirements of this Contract herein regarding the necessity of written notices of claim are not intended to abrogate the provisions of Connecticut General Statutes Section 4-61 regarding notice, and any notices required by Paragraph 10.3 of this document are in addition to those referred to in Connecticut General Statutes Section 4-61. . . .

(Doc. #47-2 at 58). Under Section 4-61 of the Connecticut General Statutes, a party "which has entered into a contract with the state . . . for the design, construction, construction management, repair or alteration of any . . . building . . . may, in the event of any disputed claims under such contract . . . bring an action against the state to the superior court for the judicial district of Hartford . . . ." CONN. GEN. STAT. § 4-61(a). Alternatively, "any such" party "may submit a demand for arbitration of such claim or claims . . . ." CONN. GEN. STAT. § 4-61(b). If arbitration is demanded, then the arbitrator's "findings of fact and decision shall be final and conclusive and not subject to review by any forum, tribunal, court or government agency, for errors of fact or law." CONN GEN. STAT. § 4-61(e).

C.      The Insurance Policy

The "Supplementary Conditions" also covered insurance as to claims stemming from the construction project. (Doc. #47-2 at 31-54). In particular, the University of Connecticut had "the option to purchase and maintain, at its cost, [commercial general liability insurance] . . . for [itself], Design/Builder, Subcontractors of all tiers and such other persons or interests as the [University of Connecticut] may designate in connection with the performance of the [project] as insured parties . . . ." (Doc. #47-2 at 33). Moreover, under the agreement, the University was required to procure "[l]iability insurance providing coverage not less than a Commercial General Liability insurance policy and insuring [itself], the State of Connecticut, the Design/Builder, Subcontractors of all tiers and such other persons or interest as the [University] may designate in connection with the performance of the work, including . . . completed operations for three years after substantial completion of the work[,] . . . such that the total available limits to all insureds combined will not be less than $2,000,000 per occurrence and $5,000,000 aggregate . . . ." (Doc. #47-2 at 34). The contract required that the furnished policy "shall not be less than that specified" in the agreement. (Doc. #47-2 at 36). In the event, however, that the University of Connecticut had not purchased the insurance, then it was obligated to "notify the Design/Builder at least ten (10) days before the Notice to Proceed is issued." (Doc. #47-2 at 33). According to Plaintiffs, such an event never occurred. (Doc. #46 at 11).

As to the subject policy itself, the language of the policy indicates that the words "we," "us," and "our" "refer to the company providing this insurance." (Doc. #48-5 at 4). The policy defines "you" and "your" as "the Named Insured shown in the Declarations, and any other person or organization qualifying as a Named Insured under this policy." (Doc. #48-5 at 4). On the policy's

declarations page, however, "UCONN 2000 PHASE II OCIP" is the only named insured. (Doc. #48-5 at 4). According to Bonney Hebert, who served as account executive to the University of Connecticut and was involved in the development of the owner controlled insurance program ("OCIP") at issue, in the late 1990s and early 2000s, several construction projects were commenced at the University. (Doc. #48-2 at 1). Those projects were designated as "UConn 2000 Phase II." (Doc. #48-2 at 1). The Hilltop Apartments project was part of that phase of construction at the University. (Doc. #48-2 at 1). Importantly, according to Hebert, "'UCONN 2000 PHASE II OCIP' is not an entity but, rather, an insurance program consisting of parties that were involved in this phase of the University's construction and that enrolled within the owner controlled insurance program. [Plaintiff CBC] was such an enrollee." (Doc. #48-2 at 2).

Indeed, Defendant's internal documents contain conflicting reports as to the clear identity of the insured. In a policy summary, Defendant identified the "insured" as "UCONN 2000 PHASE II OCIP," the "business description" as "OCIP," and the legal entity as "corp." (Doc. #52-2 at 1). Alternatively, in a Ceded Reinsurance Worksheet, printed May 22, 2001, Defendant labeled the "insured" under the policy as "UCONN 2000." (Doc. #52-2 at 3). And on a Dividend or Correction Notice, dated February 21, 2003, Defendant listed the "insured" as "UCONN Phase II." (Doc. #52-2 at 4). Lastly, and perhaps most importantly, in an internal e-mail sent October 28, 2002, Defendant's employee stated that "the direct premium [under the UCONN 2000 PHASE II OCIP] is booked in the underlying policies as they are issued throughout the policy year to the individual contractors." (Doc. #52-2 at 5).

Relatedly (and likely due to the designation on the policy's declarations page of "UCONN 2000 PHASE II OCIP" as the insured), on October 4, 2000, Plaintiff CBC requested the University

of Connecticut's OCIP administrator, Accordia Northeast, to add Plaintiff CBC as an Additional

Insured of the policy.  (2:08-CV-874, Doc. #48-11 at 2).  In response to this request, however, Helen

Dickie, on behalf of Accordia, replied:

> The Owner (The University of Connecticut) and all of its enrolled
> contractors of each tier are added to the OCIP General Liability policy
> as a Named Insured effective as of the anticipated start date.  This
> anticipated start date is also the effective date for all OCIP policies.
> Therefore, adding [Plaintiff CBC] as an Additional Insured on the
> General Liability policy is not only unnecessary, but would provide
> a lesser degree of protection than [Plaintiff CBC's] current status as
> a "Named Insured."

(2:08-CV-874, Doc. #48-11 at 2).  In this regard, Accordia, as the University of Connecticut's OCIP

administrator, confirmed that Plaintiff CBC, as an enrollee, was a Named Insured rather than an

Additional Insured.  (2:08-CV-874, Doc. #48-11 at 2).  Similarly, Accordia issued to Plaintiff CDC

on November 30, 2000 a "Certificate of Liability Insurance," which contained the same policy

number as included on the policy to which "UCONN 2000 PHASE II OCIP" was listed, and

specifically identified the "insured" as Plaintiff CDC.  (2:08-CV-874, Doc. #48-12 at 2-3).  On this

Certificate, the insurer for the commercial general liability policy was Defendant's predecessor-in-

interest, Reliance National Insurance Company, and the policy number matches that which appears

on the actual policy at issue.  (2:08-CV-874, Doc. #48-12 at 3).

The policy specified that "[a]ny entity you [*i.e.*, the Named Insured] are required in a written

contract ('the contract') to name as an insured (the 'Additional Insured') is an Insured but only with

respect to liability arising out of 'your work' for the Additional Insured, or acts or omissions of the

Additional Insured in connection with the general supervision of 'your work.'"  (Doc. #49-1 at 19).

The policy defines "your work" as follows:

8

21.    "Your work" means:
    a.    Work or operations performed by you or on your behalf; and
    b.    Materials, parts or equipment furnished in connection with such work or operations.

"Your work" includes:
    a.    Warranties or representations made at any time with respect to the fitness, quality, durability, performance or use of "your work"; and
    b.    The providing of or failure to provide warnings or instruction.

(Doc. #48-5 at 16).  Under the contract between the University and Plaintiffs CBC, as contractor, and CDC, as developer, the "Named Insured on the Owner-provided O.C.I.P. policies shall include the Owner, the State of Connecticut, their officers, agents and employees, Design/Builders and Subcontractors of any tier for whom the Owner has agreed to furnish O.C.I.P. coverage." (Doc. #47-2 at 14; Doc. #47-3 at 5-6).

According to the policy's general insuring provision:

We will pay those sums that the insured becomes legally obligated to pay as damages because of "bodily injury" or "property damage" to which this insurance applies.  We will have the right and duty to defend the insured against any "suit" seeking those damages for "bodily injury" or "property damage" to which this insurance does not apply.  We may, at our discretion, investigate any "occurrence" and settle any claim or "suit" that may result.

(Doc. #48-5 at 4).  In particular, the policy "applies to 'bodily injury' and 'property damage' only if: (1) The 'bodily injury' or 'property damage' is caused by an 'occurrence' that takes place in the 'coverage territory'; and (2) The 'bodily injury' or 'property damage' occurs during the policy period."  (Doc. #48-5 at 4).  Relevant to these provisions, the policy contains the following definitions:

9

**SECTION V—DEFINITIONS**

. . . .

13. "Occurrence" means an accident, including continuous or repeated exposure to substantially the same general harmful conditions.

. . . .

17. "Property damage" means:

    a.    Physical injury to tangible property, including all resulting loss of use of that property.  All such loss of use shall be deemed to occur at the time of the physical injury that caused it; or

    b.    Loss of use of tangible property that is not physically injured.  All such loss of use shall be deemed to occur at the time of the "occurrence" that caused it.

18.    "Suit" means a civil proceeding in which damages because of "bodily injury," "property damage" or "personal and advertising injury" to which this insurance applies are alleged. "Suit" includes:

    a.    An arbitration proceeding in which such damages are claimed and to which the insured must submit or does submit with our consent; or

    b.    Any other alternative dispute resolution proceeding in which such damages are claimed and to which the insured submits with out consent.

(Doc. #48-5 at 13-16).

**D.     Detection of Defects**

In August 2001, the building project's architect, Demarest & Associates, certified that the project was in compliance with the Connecticut Building and Fire Safety Codes.  (Doc. #42-2 at 7). Nevertheless, and over three years later, on September 29, 2004, the University of Connecticut sent a letter to Plaintiffs regarding perceived problems with construction.  (Doc. #52-3 at 1).  According to the letter, the University discovered, through routine maintenance, the presence of elevated levels of carbon monoxide in several areas of the construction, including in certain types of units throughout the Hilltop Apartments.  (Doc. #52-3 at 1).  According to the University's investigation,

10

the source of the leak "was the individual hot water heaters serving the residential units and the

insufficient draft of the exhaust from the heater through the venting system." (Doc. #52-3 at 1). In

addition to the carbon monoxide issues, the University identified the following "defects and

deficiencies" additionally attributable to Plaintiffs' work:

(a)   The venting system is inadequate as designed and/or constructed incorrectly to properly vent the water heater exhaust from individual apartment units,

(b)   The sizes of flues are questionable and vary in diameter,

(c)   The size and capacity of the air handling equipment including condensers for the two-bedroom units are too large,

(d)   There is insufficient rise in the vent connectors,

(e)   The hot water heaters on each of the floors of the buildings are vented through common flues, without separate venting for individual hot water heaters,

(f)   Improper proximity of hot water heaters to air handling units and "B" vents to combustible construction,

(g)   Violation of numerous code requirements [throughout] the complex,

(h)   Insufficient protection against emission of hot water system exhaust into individual living units,

(i)   Poor workmanship and quality control, as evidenced by cutting and crimping of the pipe material and construction and other debris found in the pipes, thus obstructing and preventing the flow of exhaust from the pipes,

(j)   Poor workmanship and quality control, as evidenced by pieces of the venting system not properly put together or sealed.

(Doc. #52-3 at 2). As a consequence of these issues, the University engaged in and planned for

remediation efforts, including "the installation of direct and separate flues from all third floor hot

water heaters, the provision for consistent sizes of piping, the installation of spill switches, the

installation of hard-wired carbon monoxide detectors directed to the University's Department of

Public Safety, the replacement or modification of the fan coil units in the two-bedroom residential

units, and other potential actions." (Doc. #52-3 at 2).

11

**E.** *Capstone Building Corporation v. Kemper Insurance Company*

In response, Plaintiff CBC forwarded the University's letter to Defendant.  (Doc. #52-4 at 1).  On December 6, 2004, Defendant acknowledged receipt of Plaintiff CBC's demand for defense against the University of Connecticut's claims.  (Doc. #52-4 at 1).  In particular, according to Defendant's analysis, the University made a claim against Plaintiff CBC after "discover[ing] during the performance of routine maintenance procedures by University personnel of elevated levels of carbon monoxide in certain of the residence units."  (Doc. #52-4 at 1).  According to the letter, after investigation, the University determined that "the source of the problem was the individual hot water heaters serving the residential units and the insufficient draft of exhaust from the heater through the venting system."  (Doc. #52-4 at 1).  Aside from the carbon monoxide related issues, the letter did not include any other explicit references to alleged property damage other than "[a]dditional defects and deficiencies in the performance by [Plaintiff CBC], its engineers and contractors . . . ."  (Doc. #52-4 at 1).  Indeed, despite the University's identification of concerns beyond the carbon monoxide level problems, Defendant referenced only the remediation efforts cited by the University of Connecticut that related to responding to elevated carbon monoxide levels.  (Doc. #52-4 at 1).

Responding to the tender, however, Defendant unequivocally denied coverage: "As the liability at issue arises out of [Plaintiff CBC's] own work, including its role as general contractor and heating and plumbing installation, there can be no coverage for this matter for Capstone under the policy."[4]  (Doc. #52-4 at 3).  In support of its declination, Defendant first characterized Plaintiff CBC as an "Automatic Additional Insured" instead of the "Named Insured" under the policy.  (Doc. #52-4

---

[4] This denial of coverage was communicated by Broadspire's letter dated December 6, 2004, but was approved by Belle Scott of AMICO as Broadspire did not have authority to deny coverage without AMICO's approval.  (Doc. #160 at 9).

at 2).  According to Defendant, only UCONN 2000 Phase II OCIP is a named insured.  (Doc. #52-4

at 2).  After determining that Plaintiff CBC is an automatic additional insured rather than a named

insured, Defendant relied on the following policy provision, which concerns coverage as to

additional insureds, to support its conclusion:

> 5.   Any entity you are required in a written contract ("the contract") to name as an insured (the "Additional Insured") is an insured but only with respect to liability arising out of "your work" for the Additional Insured, or acts or omissions of the Additional Insured in connection with the general supervision of "your work" to the extent set forth below.
>
> [. . .]
>
> c.   Except when expressly required by the contract, this insurance does not apply to "Bodily Injury" or "Property Damage" occurring after:
>
> (1)   All work on the project (other than service, maintenance or repairs) to be performed by or on behalf to the Additional Insured(s) at the site of the covered operations has been completed; or
>
> (2)   That portion of "your work" out of which the injury or damage arises has been put to its intended use by any person or organization other than another contractor or subcontractor engaged in performing operations for a principal as part of the same project.

(Doc. #52-4 at 3).  Based on this provision, Defendant reasoned, "'your work' would mean the work

of the Named Insured, or the work of UCONN 2000 Phase II OCIP.  Thus, the only coverage that

would be afforded to [Plaintiff CBC] for this matter as an additional insured under the policy would

be with respect to liability arising out of UCONN 2000 Phase II OCIP for [Plaintiff CBC], or arising

out of [Plaintiff CBC's] general supervision of UCONN 2000 Phase II OCIP's work."  (Doc. #52-4

at 3).  Accordingly, AMICO stated that "[a]s the liability at issue arises out of [Plaintiff CBC's] own work, including its role as general contractor and heating and plumbing installation, there can be no coverage for this matter for [Plaintiff CBC] under the policy."  (Doc. #52-4 at 3).  In reaching this conclusion, AMICO expressly reserved the additional right to deny coverage under any of the remaining exclusions contained in the policy.  (Doc. #52-4 at 3).  Notably, Defendant's denial did not turn on the timing and, correspondingly, the absence of a "suit," as purportedly required by the policy; instead, Defendant expressly denied coverage on the basis of substantive policy provisions.

Plaintiff CBC responded to the statement of denial with a series of letters, sent by its attorney, requesting Defendant to reconsider its initial determination.  (Doc. #52-5).  In response, on January 4, 2005 (*i.e.*, approximately one month after having received Plaintiff CBC's demand), an agent for Defendant's OCIP administrator recommended that Defendant "need[ed] to revisit this coverage issue" and opined that "[i]t is probably best to handle [the claim] under a reservation and get involved in the adjustment of the claim."  (Doc. #52-6).  Although this sentiment was reflected internally, no evidence suggests that Defendant officially communicated this assessment to Plaintiff CBC.

From Plaintiff CBC's perspective, therefore, Defendant sustained its December 6, 2004 position, which prompted Plaintiff CBC to file a lawsuit against Defendant on April 4, 2005 in the Circuit Court of Jefferson County, Alabama.  (Doc. #52-7 at 2).  In particular, Plaintiff CBC requested, *inter alia*, that the court "declare that the subject insurance policy obligates [Defendant] to provide coverage to [Plaintiff CBC] for the University's claims and contentions against [it]." (Doc. #52-7 at 3).  On March 31, 2006, Defendant removed the case to this court, and the case proceeded as *Capstone Building Corporation v. Kemper Insurance Company, et al.*, No. 2:06-CV-

14

639-JHH (N.D. Ala.).    On April 17, 2007, Judge Hancock dismissed without prejudice the

declaratory judgment action because Plaintiff CBC had failed to join the University of Connecticut,

which, at that time, was an indispensable party as to the insurance dispute.  (Doc. #52-10 at 13).

Regarding the other claims for breach of contract and bad faith, Judge Hancock dismissed them

without prejudice on ripeness grounds:

> The complaint alleges that [Defendant] breached the insurance
> contract by "denying coverage" to [Plaintiff] CBC.  However, when
> the lawsuit was filed, there was nothing for [Defendant] to cover;
> there was no "suit" as defined by the policy.    [Plaintiff] CBC
> essentially concedes as much in its opposition brief when it argues
> that [Defendant] had a duty to defend [Plaintiff] CBC when, in May
> 2006, the University presented a mediation demand, which [Plaintiff]
> CBC contends "meets the definition of a 'suit' under the" insurance
> policy.  This mediation demand, whether or not it meets the definition
> of a "suit," occurred thirteen months after the complaint was filed in
> this case.   It cannot be the basis for either the breach of contract or
> bad faith claims.

(Doc. #52-10 at 12).  Neither party appealed Judge Hancock's decision or requested reconsideration.

Accordingly, Plaintiff CBC's case did not, through judicial action, reverse Defendant's coverage

position.

### F.    *American Motorist Insurance Co., Inc. v. Capstone Development Corp., Inc.*

Similarly, on May 9, 2005, Plaintiff CDC sent a letter to Defendant.  (2:08-CV-874, Doc.

#48-2 at 2).  Plaintiff CDC, pursuant to the policy, requested Defendant to review the claims asserted

by the University of Connecticut. (2:08-CV-874, Doc. #48-2 at 2). In response, however, on July 18,

2005, Defendant responded to the request and, after noting that the matter did not "appear[] . . . [to]

potentially implicate" the policy, declined to "provide a coverage position at [that] time." (2:08-CV-

874, Doc. #48-3 at 2).  Defendant requested that, if Plaintiff CDC disagreed with the assessment,

then Plaintiff should "advise [Defendant] immediately."  (2:08-CV-874, Doc. #48-3 at 2).

      On January 9, 2006, CDC's representative, Bill Lyle, contacted an AMICO adjuster named

Darryl Swank.[5]  (Doc. #159 at 7).  At the time, Swank was the adjuster handling the pending (but

---

[5] Swank was the claim handler responsible for dealing with CDC (and CBC) from January 2006, through June 2007. (Doc. #159 at 31).  This time period encompasses the entirety of the time that the declaratory judgment action that AMICO filed against CDC was pending.  (*Id.*).  Swank had been unemployed from June 2003 until January 2004 having been laid off from his previous employer, Statewide Insurance.  (*Id.*).  He was hired at AMICO through a temporary employment agency, and at that time understood that AMICO was in "runoff," was going out of business, and that this was a dead-end job.  (*Id.*).  He also knew that Kemper's "claims" workforce was down to less than 200 people when it had previously been many "thousands."  (*Id.*).  When he arrived at work, he was handed about 200 "construction defect" files to handle.  (*Id.*).  Swank has admitted that AMICO did nothing to train him or to ensure that he was qualified to handle "construction" claims or "coverage" issues in Connecticut or Alabama:

> Q. Had you had any experience with construction defect claims in Connecticut before you went to work for Kemper?
> A. Not that I'm aware of.
> Q. Had you had any experience handling a coverage dispute with the insured or bad faith type of issues in Connecticut before you went to work for Kemper?
> A. No.
> Q. What training, if any, did Kemper give you in claims handling when you started with them?
> A. None.
> Q. Did they give you a copy of their best practices?
> A. No.
> Q. Did they give you a copy of their claims manual?
> A. No.
> Q. Did they give you any sort of reference materials at all to help you in the process?
> A. No.
> Q. Did they give you any training on Connecticut law?
> A. No.
> Q. Did Kemper give you any training on the Connecticut Unfair Insurance Practices Act?
> A. No.
> Q. Were you given any training on Alabama claims or law?

as of then not yet filed) litigation between AMICO and CBC. Swank has testified that this conversation "was the first that I really knew anything about this Capstone Builders or either entity . . . ." (*Id.*). Lyle claims he memorialized that conversation[6] in an email to CDC, as follows:

> I just spoke with Kemper Claim Representative Darryl Swank. Darryl is handling the CBC file now and advised they are defending against the [declaratory judgment] action filed by CBC. I explained the distinction between CBC and CDC and the applicable coverage under the OCIP policy. He agrees that the throw back coverage which provides protection to CDC when work is done on our behalf by a subcontractor is applicable. He questions at this point whether UCONN has sustained property damage as must be resultant from an occurrence …. He agreed that the disclaimer letter to CBC did not contain the complete coverage language.

(*Id.*).

Swank admitted to Lyle that there would be coverage for "property damage," but did not know whether there was any "property damage." (*Id.* at 8). Swank told Lyle that "there were multiple claims of this type around the country that Kemper was having to battle" and gave Lyle "the impression that they were going to fight them rather than roll over and pay them, because there were just too many of them." (*Id.*).

On February 6, 2006, Plaintiff CDC again sent a letter to Defendant and requested defense against the claims asserted by the University of Connecticut in connection with the mediation demands. (2:08-CV-874, Doc. #48-4 at 2). In his deposition, Swank was asked, "What to your

------

A. No.
Q. Had you ever handled any Alabama claims before?
A. Not sure.

(*Id.* at 32-33).

[6] Swank testified that he cannot remember the content of his conversation with Lyle and is not in a position to agree or disagree with Lyle's summary. (*Id.*).

knowledge investigation or analysis or evaluation was done at AMICO or Kemper in response to this letter?" and, "Did you personally do anything in response to this letter of February 6, 2006?" (*Id.* at 8).  He testified that he "believes" he forwarded the letter to AMICO's counsel, Tom E. Ellis, but he otherwise did not answer these questions.[7]  AMICO never responded to the February 6, 2006, letter.[8]  (*Id.*).

AMICO's Rule 30(b)(6) witness, James Hawkins, stated that he has no knowledge as to what was done by AMICO in response to the February 6, 2006 letter.  (*Id.* at 9).  He admits that the February 6th letter would qualify as a "loss notice" and would justify the opening of a "claim file." (*Id.*).  Hawkins also admits that while, upon receipt of such a letter, obtaining a coverage opinion from outside counsel would be standard procedure, that was not done.  (*Id.*).

On March 20, 2006, CDC again wrote Swank requesting coverage.  (*Id.* at 9).  However, AMICO never responded to that March 20, 2006 letter.  (*Id.*).  Hawkins, while testifying as AMICO's Rule 30(b)(6) deponent, was not able to offer any explanation for Swank's failure to (1) respond to the March 20th letter or (2) agree to attend the anticipated mediation.  (*Id.* at 10).

On May 31, 2006, almost two months after Plaintiff CBC filed the above-mentioned lawsuit and after Plaintiff CDC again requested that Defendant address the University of Connecticut's claims, Defendant filed a "Complaint for Declaratory Judgment" against Plaintiff CDC in this court.

---

[7] Plaintiffs contend that many of the coverage decisions in this case have been driven by outside counsel.  For example, they note that Swank testified: "Basically I was nursemaiding the file, it was sitting there, any actions or anything that was being done was being done by Mr. Ellis."  (*Id.* at 16).  Swank, the primary person at AMICO with responsibility for this claim for two years, went on to testify that he has never had an opinion as to whether or not there was coverage in this case. (*Id.*).

[8] Swank does not know why AMICO never responded to this letter, but he knows the "letter was never responded to, that I can tell you."  (*Id.*).

(2:08-CV-874, Doc. #48-5 at 2).  The case proceeded as *American Motorist Insurance Co., Inc. v. Capstone Development Corp., Inc.*, Case No. 2:06-CV-1032-WMA (N.D. Ala.).  (2:08-CV-874, Doc. #48-9 at 2).  Defendant – the plaintiff in that case – requested the court to declare "that there is no responsibility, coverage, protection, or obligation or liability to pay any sums or perform any acts on behalf of [Plaintiff CDC] for the claims asserted by [the University of Connecticut] under the [subject] policy of insurance . . . ."  (2:08-CV-874, Doc. #48-5 at 14).  In the complaint, Defendant did not allege that the mediation demand was insufficient to trigger coverage; instead, Defendant identified various substantive exclusions in the policy, presumably on which it relied to assert that coverage did not extend to the underlying claims.  (2:08-CV-874, Doc. #48-5 at 5-10). Additionally, Defendant alleged that, pursuant to the building contract for the Hilltop Apartments project, "[the University of Connecticut] and [Plaintiff] CDC, among others, entered into an Owner Controlled Insurance Program" and Plaintiff "CDC and [the University] were joint participants in the UCONN 2000 PHASE II OCIP."  (2:08-CV-874, Doc. #48-5 at 3-4).

Nevertheless, on May 18, 2007, Plaintiff CDC filed a motion requesting dismissal for Defendant's failure to join the University of Connecticut, which Plaintiff CDC contended was an indispensable party under Federal Rule of Civil Procedure 19.  (2:06-CV-1032, Doc. #46).  Judge Acker granted the motion and "agree[d] that [the University of Connecticut] [was] a necessary and indispensable party to [that] action."  (Doc. #48-9 at 4).  Judge Acker, therefore, dismissed the case without prejudice.  (2:08-CV-874, Doc. #48-9 at 10).  Neither party appealed the decision or sought reconsideration.

Plaintiffs claim that prior to the filing of the Declaratory Judgment Actions involving them, Kemper inexplicably responded to their demand by denying coverage under an inapplicable excess

policy.  Also prior to any litigation between the parties, CDC had contacted Swank and explained the distinction between CBC and itself and the applicable coverage under the OCIP policy.

Prior to May 31, 2006, AMICO did not communicate any coverage position to CDC relating to the subject OCIP policy.  AMICO did not send an acknowledgment letter, a reservation of rights letter, or any denial letter.  Nor did AMICO conduct an interview of the insured, obtain any recorded statements, visit or inspect the UCONN construction site, hire experts, interview UCONN, or interview witnesses.  (Doc. #159 at 11).  Swank admits that these actions "can be" common in claim investigations.  (*Id*.).  Swank has admitted that AMICO did not obtain any coverage evaluation or coverage opinion prior to filing the declaratory judgment action.  (*Id*. at 12).  He further admitted that he never looked at whether or not there was coverage for CDC or anyone else.  (*Id*.).  He also testified that he was not sure if any investigation of CDC's demand was undertaken:

> Q. As we sit here today you have no recollection of what you did in the claims department at AMICO in investigating or analyzing or evaluating the request for coverage from CDC before the Declaratory Judgment?
> [Objection omitted].
> A. I don't recall doing anything.  I would imagine it would be in the file if there was any.

(*Id*. at 13).  Likewise, AMICO's Rule 30(b)(6) witness, Hawkins, could not testify as to any investigation that was performed by AMICO prior to the filing of Defendant's declaratory judgment action, and Hawkins has admitted that he has seen no evidence at all that would reflect that AMICO did anything to investigate the claim between February and May of 2006.  (*Id*.).  Hawkins testified that he has never even seen the subject insurance policy and has no knowledge or understanding of what CDC's role was in the construction project, what CBC's role was in the construction project, or whether any effort was ever made by AMICO to determine whether or not CDC's claim should

be addressed differently from CBC's.[9]  (*Id.*).  Plaintiffs contend that this is contradicted by the "prayer" in the declaratory judgment action itself as well as the fact that during the course of this controversy AMICO has never accepted coverage.[10]  (*Id.* at 14).

### G.     Mediation between Plaintiffs and the University of Connecticut

During the pendency of those cases, and as referenced in Judge Hancock's decision, on May 16, 2006, the University of Connecticut sent to Plaintiffs CDC and CBC, as well as others, a letter formally requesting their participation in mediation.  (Doc. #53-1 at 1).  On the same day, Plaintiff CBC sent a letter to Defendant and, again, demanded its defense in conjunction with the mediation.  (Doc. #53-5 at 1).  On May 31, 2006, Defendant responded to Plaintiff CBC's demand and represented that it had no obligation to defend Plaintiff CBC during the course of the mediation.  (Doc. #53-6 at 1-2).  As a basis for its position, Defendant directed Plaintiff CBC to its answer in the case pending before Judge Hancock.  (Doc. #53-6 at 1).  According to Defendant's answer, aside from generic affirmative defenses, the following was the only context-related response: "[Defendant] den[ies] that it has a contract with Plaintiff and further denies a breach of any performance thereunder."  (2:06-CV-639, Doc. #3 at 1).  From this representation, Plaintiff CBC concluded, in response, that it was "once again left with only the December 6, 2004 denial letter . . . as apparently articulating the basis for the insurer's original and on-going declination."  (Doc. #52-5 at 3).[11]

---

[9] At the deposition, Hawkins was unable to provide any explanation for the reasons that AMICO says there is "no coverage."  Indeed, Hawkins continued to assert that "there has been no denial of a claim for coverage."  (*Id.* at 14).

[10] AMICO has refused to answer the question of whether or not it has ever declined any claims submitted by CBC or CDC.  (*Id.*).

[11] Defendant contends it filed a declaratory judgment action to seek a determination of whether it had coverage; however, in that action Defendant asserted it had no duty to CDC under the

21

On October 25, 2006, Plaintiff CBC, Plaintiff CDC, and the University of Connecticut, among others, finalized their deadlines for the proposed mediation. (Doc. #52-8). According to their schedule, no later than December 31, 2006, the University would submit its revised demand package with supporting documentation. (Doc. #52-8). By March 15, 2007, the parties would exchange position papers, and by April 1, 2007, the parties would exchange replies. (Doc. #52-8). Tentatively, the mediation was set to last for six days – two days per month for three consecutive months. (Doc. #52-8).

In light of the agreed upon schedule, on December 28, 2006, the University issued a "Revised Demand for Mediation and Summary of Claims." (2:08-CV-874, Doc. #47-4, Ex. 4 at 1). In the Revised Demand, the University claimed that, as a result of the various building and design defects, Plaintiffs CDC and CBC, as well as others, breached their agreement with the University by failing to properly implement the construction plans. (2:08-CV-874, Doc. #47-4 at 9). Additionally, the University asserted that Plaintiffs CDC and CBC had been negligent and breached their warranties under the contract as a result of the identified defects. (2:08-CV-874, Doc. #47-4 at 12-17). The University claimed damages in excess of $25,000,000, which included "necessary corrective work," "the need for peer reviews . . . to review and design proposed changes and revisions," "loss of use of the premises resulting in rebates of rent to students for the periods of evacuation of the housing units or for periods when systems[] such as . . . air conditioning . . . was not operational," and "damages associated with [Plaintiffs'] failure to perform [their] work in compliance with the Contract, codes, State laws, and regulations." (2:08-CV-874, Doc. #47-4 at 17).

---

policy. Plaintiff's position is that Defendant had already determined it did not have coverage and reached that position without performing any investigation.

The University also detailed its remediation efforts, which the University divided into two phases. (2:08-CV-874, Doc. #47-4 at 18-25).  According to the attachments to the Revised Demand, in Phase One (2004-2005), the University required the following updates to ensure code, contract, and safety compliance:

(1)     The installation of heating units and flue vents in mechanical closets "violated the State Building Code in that flue vents were not installed in shaft enclosures through fire-resistant floor assemblies and the flue vents from multiple stories were stacked into a common flue vent." (2:08-CV-874, Doc. #47-4 at 18).  The University estimated the cost of remediation at $10,849,492.  (2:08-CV-874, Doc. #47-4 at 18).

(2)     The vent for the washing and drying machines exceeded the code specifications by nineteen inches.  (2:08-CV-874, Doc. #47-4 at 18).    The University estimated the cost of remediation at $636,206.  (2:08-CV-874, Doc. #47-4 at 18).

(3)     "The State Building Code requires that 4% of the student apartments be handicapped accessible.  During the design phase, [Plaintiff CDC] failed to properly plan for the proper number of apartments.  To comply with the State Building Code additional apartments had to undergo significant modifications to allow accessibility." (2:08-CV-874, Doc. #47-4 at 18).    The University estimated the cost of remediation at $595,835.

(4)     "At various locations in the installation liquid tight flexible non-metallic conduit was employed.  In many instances, an inadequate number of supports were installed, especially adjacent to the exterior condenser units." (2:08-CV-874, Doc. #47-4 at 19).    The University estimated the cost of remediation at $35,264.

(5)     "The design documents called for metal drain pans to be located under air handling units to comply with the State Building Code and to protect the adjacent area surrounding the mechanical equipment in the event the primary drain is blocked.  The auxiliary pans were not installed." (Doc. #47-4

23

at 19).  The University estimated the cost of remediation at $409,063.  (2:08-CV-874, Doc. #47-4 at 19).

(6)     "The electrical design called for recessed light fixtures in the ceilings of many of the units.  The units specified were replaced with a substitution by the electrical contractor and approved by [Plaintiff] CDC's electrical engineer.  The substituted units, however, did not allow contact with insulation, as was required for that application."  (2:08-CV-874, Doc. #47-4 at 19).  The University estimated the cost of remediation at $25,545.  (2:08-CV-874, Doc. #47-4 at 19).

(7)     "The plans for the units included many exit doors that led only a short distance from the apartment buildings.  The State Building Code requires that the exit discharge must lead from the exit doors to a public way.  Further, it was revealed that there were missing handrails, improper slopes and inaccessible egress."  (2:08-CV-874, Doc. #47-4 at 19).  The University estimated remediation at $86,094.  (2:08-CV-874, Doc. #47-4 at 19).

(8)     "[T]he stair rails did not extend at least 12" beyond the top riser and the depth of one tread beyond the bottom riser.  The rails had to be extended to meet the code.  Also . . . there were not barriers underneath the stairs to protect people from colliding with the bottom of the stairs."  (2:08-CV-874, Doc. #47-4 at 19).  The University estimated remediation at $122,323.  (2:08-CV-874, Doc. #47-4 at 19).

(9)     Cabinets containing fire extinguishers "protrude[d] more than 4" into egress paths, resulting in a code violation."  (2:08-CV-874, Doc. #47-4 at 19).  The University estimated remediation at $139,758.  (2:08-CV-874, Doc. #47-4 at 19).

(10)    "The design of the structures designated the buildings as Type 5A wood framed structures with sprinkler protection.  Based on that designation, the drawings further provided fire-rating requirements for floor and roof assemblies.  Notwithstanding those designations, the actual installation compromised the fire-rating because of numerous heater flues, light fixtures and ductwork penetrations into those fire-rated assemblies."  (2:08-CV-874, Doc. #47-4 at 20).  The University estimated the cost of remediation at $2,363,085.  (2:08-CV-874, Doc. #47-4 at 20).

(11)    At odds with the State Building Code, "gypsum wallboard was installed adjacent to Fire Sprinkler devices and valves in stair shafts." (2:08-CV-874, Doc. #47-4 at 20). The University estimated the cost of remediation at $9,011. (2:08-CV-874, Doc. #47-4 at 20).

(12)    "[E]lectrical panels in buildings 19 and 20 had been designed and installed in clothes closets which is a violation of the State Building Code." (2:08-CV-874, Doc. #47-4 at 20). The University estimated the cost of remediation at $36,696. (2:08-CV-874, Doc. #47-4 at 20).

Following Phase One, the University initiated Phase Two of its remediation efforts, which occurred during 2006:

(1)    "[T]he lack of continuity of the stair shaft wall was a violation of code." (2:08-CV-874, Doc. #47-4 at 21). "[A]n additional code deficiency of the penetration of the shaft wall assemblies by floor trusses also existed." (2:08-CV-874, Doc. #47-4 at 21). While the University began repairing these issues with the stair shafts, "water damage was discovered in the stair shaft wall of building 19. Upon further investigation, it was discovered that the water damage originated from a leak in a water pipe due to its penetration by a screw during the original construction. The water leak led to the discovery of plumbing systems penetrating the shaft wall which was also a code violation." (2:08-CV-874, Doc. #47-4 at 21). "During this process [of addressing the aforementioned problems], condensate piping and refrigerant piping was found penetrating the fire separation assembly. In some buildings, this work required the existing kitchen fixtures and cabinetry to be removed, utilities to be removed and relocated and the original kitchen fixtures and cabinetry reinstalled." (2:08-CV-874, Doc. #47-4 at 21). The University estimated the cost of remediation at $5,900,000 and the lost revenue associated with the evacuation of students at $1,160,000. (2:08-CV-874, Doc. #47-4 at 22).

(2)    "The design and installation of the Hilltop Apartment fire protection system resulting in several code deficiencies." (2:08-CV-874, Doc. #47-4 at 22). The University estimated the cost of remediation at $1,800,000. (2:08-CV-874, Doc. #47-4 at 22).

(3)     "[T]he design and construction of firewalls and attic spaces" resulted in "several code deficiencies." (2:08-CV-874, Doc. #47-4 at 22).   The University estimated the cost of remediation at $82,462.  (2:08-CV-874, Doc. #47-4 at 22).

(4)     Electrical installations violated the State Building Code. (2:08-CV-874, Doc. #47-4 at 23).  For example, "electrical panels [were] installed in fire rated walls along with duplex receptacles that were loose, device face plates . . . were improperly installed, and outlet and switch device boxes . . . were recessed more than 1/4" from the finished surface." (2:08-CV-874, Doc. #47-4 at 23).  Additionally, "no warning ribbon was installed over some of the secondary direct burial cables and the warning ribbon that was in place was installed improperly, less than 12" above the service lateral. . . . [I]nadequate grounding was provided at each main panel board." (2:08-CV-874, Doc. #47-4 at 23).  Finally, "outlets for the kitchen range . . . had connectors left unattached to the device boxes and exposed copper conductors in the wall cavity. . . .[,] time delay relay devices for the bathroom exhaust fans [were improperly installed, and] fire alarm audible sound in individual apartments [was] set to the wrong tone." (2:08-CV-874, Doc. #47-4 at 23).  The University estimated the cost of remediation at $784,995. (2:08-CV-874, Doc. #47-4 at 23).

(5)     Regarding interior egress, the following State Building Code violations were discovered: "(1) handrails that were located less than 34" from the nose of the tread in the exit stair enclosures; (2) exit stair enclosures that did not contain tactile signage; (3) a lobby entrance/exit in building 22 that was not constructed as shown on the drawings [which] result[ed] in non-compliant doors; and (4) there was only one exit for lower level units in buildings 19 and 20, where the code required two exits." (2:08-CV-874, Doc. #47-4 at 23).  The University estimated the cost of remediation at $487,701. (2:08-CV-874, Doc. #47-4 at 23).

(6)     Exterior code violations were also discovered. (2:08-CV-874, Doc. #47-4 at 24).  In particular, "[t]read and riser dimensions on exterior egress stairs were found to exceed the required dimensional uniformity.  Several rear exists discharged onto the lawn without clear paths to travel to public way and erosion was observed on temporary gravel walkways." (2:08-CV-874, Doc. #47-4 at 24).  Because the University, at the

time of the Revised Demand, was investigation possible solutions, the cost was not yet determined. (2:08-CV-874, Doc. #47-4 at 24).

(7)   The University discovered that "the rigid metal conduits used to sleeve the direct burial cables into the transformer pads . . . were not properly bonded resulting in a code deficient installation. . . . [I]mproper backfill material was used around the direct burial of secondary cables." (2:08-CV-874, Doc. #47-4 at 24). At the time of the Revised Demand, the University was exploring possible remediation approaches, and consequently, the cost was not yet determined. (2:08-CV-874, Doc. #47-4 at 24).

(8)   "[A] sample of magnetic door hold-open devices . . . appeared to be operating at higher than normal temperatures[, which] result[ed] in . . . code discrepancies." (2:08-CV-874, Doc. #47-4 at 24). At the time of the Revised Demand, the cost was not yet determined. (2:08-CV-874, Doc. #47-4 at 24).

(9)   Finally, the University "identified various code issues that [were] considered maintenance issues . . . : (1) roof trusses that had been cut in the mechanical room of apartment buildings; (2) incandescent light fixtures that were improperly installed in closets; (3) temporary lighting cords and applicant cords that were found to be improperly installed in various locations; (4) missing escutcheon plates, electrical box covers and light fixture covers, along with broken light fixtures and sprinkler heads; (5) water flow devices mounted too close to the ceiling and an improperly mounted smoke detector; and (6) . . . CO detector cables in mechanical closets . . . were not supported or properly protected." (2:08-CV-874, Doc. #47-4 at 24-25). Similarly, "two aluminum conductors rated at 500 amps were improperly connected to a 600 amp breaker and inadequate ground rod protection was used at each main panel board in the original construction . . ." (2:08-CV-874, Doc. #47-4 at 25).

Based on these deficiencies and remediation projects implemented in Phases One and Two, the University demanded from Plaintiffs, as well as others, a total amount in excess of $25,000,000. (2:08-CV-874, Doc. #47-4 at 25).

On December 26, 2007, the parties to the mediation finalized and signed the proposed settlement agreement. Plaintiffs CDC and CBC agreed to each pay the University of Connecticut $1 million. In addition to the actual value of the settlement, Plaintiffs CDC and CBC incurred substantial attorney's fees in the course of defending themselves against the claims asserted by the University of Connecticut.

### H.   AMICO's Coverage Positions Challenged by Plaintiffs

#### 1.   AMICO's Contention That Plaintiffs Were Not Insureds

At various times AMICO has contended that neither CDC nor CBC was a "named insured" and therefore neither Plaintiff was entitled to coverage. (Doc. #159 at 14). This position was taken as early as December 6, 2004, when AMICO's agent (third-party administrator "Broadspire") sent a denial letter to CBC, stating, "UCONN 2000 Phase II OCIP is the only named insured under the policy . . . . In this case, 'your work' would mean the work of the Named Insured, or the work of UCONN 2000 Phase II OCIP." (*Id.*). Thus, AMICO concluded, "There can be no coverage for this matter for Capstone under the policy." (*Id.*). AMICO has continued to assert this argument as a ground for denying coverage. (*See* Doc. No. 41 at pp. 29-32, 35-40). Darryl Swank has admitted that he has no knowledge of the meaning of the named insured, "UCONN 2000 Phase II OCIP."[12] Swank does not know who the named insured, "UCONN 2000 Phase II OCIP" is, has never looked into it and admits that he does not know what the intent behind that provision. (Doc. #159 at 15). Swank further testified that he has no idea how to determine which contractors were enrolled in the

---

[12] "UCONN 2000 PHASE II OCIP" is not an entity but an owner controlled insurance program ("OCIP") for the various University construction projects falling within the UCONN 2000 Phase II construction. (Doc. #160 at 6). Various parties involved in the Hilltop project, including CBC, enrolled in the UCONN 2000 PHASE II OCIP. (*Id.* at 7). For the most part, CBC used trade subcontractors to actually perform the construction work for this project and "self-performed" very little work. (*Id.*).

OCIP.  (*Id*.).  Hawkins also testified that he has no knowledge as to whether or not CDC was a "named insured."  (*Id*.).  He, as well as AMICO's other Rule 30(b)(6) witness (John McGregor), do not know and cannot explain what "UCONN 2000 PHASE II OCIP" means and do not even know why it is important. (*Id*.).  As part of a case previously litigated between CBC and AMICO, Hawkins testified as follows:

> Q. Okay. So, from AMICO's position, as of the filing of this lawsuit in April 2005, it was not important in any way as to the structure of the — of the type of entity of the named insured to determine who is an insured under the policy?
> A. That's correct.

(*Id*. at 17).

Plaintiffs contend that any confusion over the identity of the "named insured" could have been easily resolved by AMICO with a phone call – in the years 2004, or 2005, or 2006, or any time thereafter – to the policy's broker, Bonney Hebert.  (*Id*.).  Ms. Hebert has testified that both CDC and CBC (and all other "enrolled" contractors in the UCONN 2000 Phase II OCIP) were "named insureds."  (*Id*.).  However, AMICO has never contacted Ms. Hebert at any time. (*Id*. at 17-18).  Moreover, AMICO has never reconsidered its position on the "named insured" issue despite being provided an affidavit from Ms. Hebert in or around February 2007.  (*Id*. at 18).  Beginning in June 2007, and continuing until today, the AMICO claim handler has been Bill Micheletti. (*Id*.).  Plaintiffs contend Micheletti has never done anything to determine the identity of the "named insured" or to determine the meaning of "UCONN 2000 Phase II OCIP."  (*Id*.).  He admits that he has no factual basis for concluding that "UCONN 2000 Phase II OCIP" means "University of Connecticut." (*Id*.).  AMICO's agent, Paul Meany, an employee of Broadspire, has testified that contacting the broker and obtaining the "roster" of contractors enrolled in the OCIP "would be the first step to see if they are insured" but that this was never done by AMICO.  (*Id*.; Doc. #160 at 9).

From October 2004, when the University of Connecticut first asserted claims against CBC, through April 2005, Paul Meany of Broadspire was primarily responsible for overseeing this claim. (Doc. #160 at 9).  Meany was a senior technical claim representative who handled high exposure claims.  Meany has been in the insurance claims business for 40 years.  (*Id.*). Even though Meany had dealt with a number of owner-controlled insurance programs ("OCIP"), Meany testified that he did not know who the named insured, shown on the policy as "UCONN 2000 Phase II OCIP," actually was.  (*Id.*).  Despite Meany's inability to identify the named insured, Broadspire denied CBC's initial request for coverage after determining that CBC was not a named insured, but rather an additional insured. (*Id.*). As an additional insured, Broadspire further determined that CBC had no coverage based on an exclusion in the policy "[a]s the liability at issue arises out of Capstone's own work, including its role as general contractor and heating and plumbing installation." (*Id.*).

CBC's attorney promptly responded by informing Meany that a subcontractor, not CBC, performed all of the heating installation that was the subject of the carbon monoxide release in the apartments, and CBC only self-performed some of the plumbing work. CBC's attorney asked AMICO to reconsider its position.  (*Id.*).  Meany told Belle Scott of AMICO that a subcontractor, not CBC, performed the heating and plumbing work.  (*Id.*).  Meany recommended to AMICO that "[i]t is probably best to handle under a reservation and get involved in the adjustment of the claim." (*Id.* at 10).  Even after these events, Meany's superior stated in an internal e-mail that "the reason there is no coverage is that they [CBC] do not qualify as an insured."  (*Id.*).  Even though AMICO based its denial on the false position that CBC had itself performed the heating and plumbing work, AMICO never changed its position. (*Id.*). As Meany testified:

> Q. And he [CBC's attorney] was asking Amico to reconsider its denial of December 6, 2004 based on this new information, correct?
> A. Yes.

Q. And, in fact, you made the request – or recommendation, I should say – to Belle Scott at Amico that Amico reconsider and handle this matter under a reservation and get involved in the adjustment of the claim; didn't you?

A. Yes.

Q. You said that in an e-mail dated January 4, 2005, which was Exhibit 1, correct?

A. Yes.

Q. And Amico never did that; did they?

MR. ELLIS: Object to the form.

A. Correct.

Q. They never got involved in the claim; they never issued a reservation of rights?

MR. ELLIS: Objection to the form. You're not identifying which claim.

Q. Correct?

A. Correct.

Q. And, in fact, nothing changed, and you continued to get no responses from Amico, as we saw through those e-mails, until Mr. Hogewood finally had to send a lawsuit, correct?

MR. ELLIS: Object to the form, whether he had to file a lawsuit.

A. Correct.

(*Id*. at 10-11).

## 2.    AMICO's Alleged Failure to Investigate

AMICO admits that an insurance company should fairly, objectively, and thoroughly investigate a claim for coverage and has a written "Claim Department Code of Conduct and Service Standards" ("the Code").  (Doc. #159 at 30).  The Code provides:

a. "We will promptly and fairly handle all claims in a manner consistent with the principles and practices in the Code of Conduct, the Claim Department Service Standards, and our Claim Department Manuals."

b. "I will help our policyholders in the processing of their claims and will courteously and promptly advise them, as well as other claimants, of the company's position on claims handled by me."

c. "In addition to the standards detailed in the Code of Conduct, the Kemper Insurance Company is pledged to conduct itself in accordance with . . . Unfair Claim Practices Acts . . . . We recognize and follow the Model Act in all instances, except in jurisdictions which have enacted unfair claim practices legislation broader in scope

than the Model Act, in which instances we recognize and comply
with the applicable local legislation."

d. "Service standards of the Kemper Claim Department require
prompt, just and courteous claim service."  The claim handler's goal
is to:

> i. "Explain the claim process in understandable terms
> to persons making claims, or their representatives.
> Assist those parties in the resolution of their claim and
> provide explanations of our settlement or denial
> decisions. Respond to inquiries and complaints
> immediately and always within 24 hours."
>
> ii. "Resolve claims quickly, protecting the interests of
> all clients by investigating claims thoroughly,
> pursuing all cost containment opportunities, and
> promptly paying just and equitable claims."
>
> iii. "Voice-to-voice contact with claimants within two
> business days of a reported commercial lines loss . . .
> either in person or by telephone, is our goal. When
> that is not possible, written contact will be established
> by facsimile, data link or letter, and always within five
> business days."
>
> iv. "Conduct ourselves in a professional, responsible,
> lawful, and ethical manner at all times."
>
> v. "Enhance claim service to consumers by educating
> our producers, clients and policyholders on coverage,
> claim procedures, and cost containment techniques,
> helping them realize the full value of the services they
> have purchased."

(*Id*. at 33-34) (internal record cites omitted).  Plaintiffs have presented substantial evidence that

AMICO did not do any of this.  (*Id*. at 34).

The "Claim Department Manual" provides that, in questionable coverage situations, and

"[t]o preserve the company's rights under the policy, [AMICO must] send the insured a certified

letter listing all the known reasons for questioning coverage and informing the insured that we are

reserving our right to deny coverage," and then "take action within 30 days after issuing the

reservation of rights letter."  (*Id*. at 35).  Plaintiffs contend AMICO never did this.  (*Id*.).  Also,

where claims involve multiple insureds (such as this one, where UCONN, CDC, and CBC were all

insured under the AMICO policy), the Claim Department Manual recognizes a potential "conflict of interest." (*Id*.). Therefore, the Manual requires AMICO to "set up a separate claim file for each insured," and to "assign each file to a different claim rep." (*Id*.). Plaintiffs have presented substantial evidence that AMICO never did this. In a situation where the "insured is seeking coverage" and "the company feels no coverage exists," then the Manual requires that AMICO "handle the liability question in the usual manner; investigate the question of coverage separately under a reservation of rights; and employ separate counsel to handle coverage questions if necessary (check court rulings in your state to determine your rights, duties, and obligations)." (*Id*.). Plaintiffs have presented substantial evidence that AMICO never did this. (*Id*.).

The Manual provides some basic, threshold questions that must be answered in an initial analysis of coverage, including:

> a. Have you checked policy information to be sure it applies to the loss?
> b. Is the person seeking coverage an insured as defined in the policy?
> c. Does the claim fall within the scope of the insuring agreement of the policy?
> d. Do any jurisdictional requirements (*e.g.*, state laws, court decisions) affect the handling of the claim?

(*Id*. at 36). Plaintiffs have presented substantial evidence that AMICO never did any of this.

The "Best Claim Handling Practices" which have been adopted by AMICO call upon it "to establish and maintain good communication with all key parties to the claim to facilitate investigation and claim control." (*Id*.). This includes: (1) "contact with insured in two business days;" (2) "complete explanation of the claim process on initial contact;" (3) "confirmation of accident facts, including a recorded statement when warranted;" (4) "face-to-face contact with claimants and insureds on certain significant claims;" and (5) "appropriate follow-up contact with claimants, their attorneys and the insured throughout the life of the claim is required to effectively

evaluate developments and make the necessary adjustments to the overall case strategy."  (*Id.*).

Plaintiffs have presented substantial evidence that AMICO never did these things.  (*Id.*).

The "Best Claim Handling Practices" also states that "a prompt, thorough investigation

provides the framework for timely analysis of coverage, liability, and damages, effective case

management, the pursuit of all cost-containment opportunities, and the expeditious issuance of just

and equitable payments."  (*Id.* at 36-37).  Such an investigation "includes, but is not limited to" the

following:

> a. Prompt quality contact
> b. Analysis of all available insurance coverages and issuance of coverage positions, when appropriate
> c. Initial investigation that is completed within 30 days from the date of loss notice
> d. Recorded statements from involved parties, when necessary, including witnesses
> e. On-site investigations when warranted to obtain photos of accident location and search for potential witnesses and other evidence
> f. Identifying or obtaining the alleged defective product or object causing the accident or injury
> g. Obtaining the necessary experts to assist in the investigation
> h. Review contracts and legal documents (*e.g.*, lease agreements, insured contracts, hold-harmless agreements, etc.), when appropriate
> i. Preserve physical evidence that will be required for inspection, future testing, etc.

(*Id.* at 37).  Plaintiffs have presented substantial evidence that AMICO never did any of this.  (*Id.*).

The "Best Claim Handling Practices" states that "we view effective communication as one

of the most important aspects of claim management.  (*Id.* at 37-38).  Our staff will work closely with

our customers to develop claim strategies; return all phone calls as soon as possible and always

within one business day; and respond to all written communications as soon as possible and always

within five business days."  (*Id.* at 38).  Plaintiffs contend AMICO never did this.  (*Id.*).

Where its insured is facing a third-party liability claim (such as UCONN was making against CDC), the "Best Claim Handling Practices" states that AMICO will "attempt settlement of lawsuit or seek extension of time to respond, if appropriate, before assigning to defense counsel;" "use mediation or arbitration, when appropriate;" "perform additional investigation, as appropriate, during discovery;" and "actively seek opportunities to open settlement negotiations resulting in cost-effective resolution." (*Id*).  Plaintiffs have presented substantial evidence that AMICO never did this.  (*Id*.).

The "Best Claim Handling Practices" requires "that all claims be accurately evaluated in light of the facts, policy provisions, prevailing law and equity." This includes:

> a. Evaluate early in the claim whether a settlement will be owed.
> b. Determine the settlement value of the claim and document the reasoning.
> c. All disclaimer and reservation of rights will be put in writing, explaining our coverage position.
> d. All initial reservation of rights letters will be followed up in writing within 30 days with our final coverage decision (if a determination cannot be made, the 30-day letter will explain why a final decision has not been reached and what is needed to make the decision).
> e. All denials of liability will be confirmed in writing and always in compliance with applicable state laws regarding Unfair Claim Practices Acts.
> f. All claim discussions and negotiations will be conducted in good faith with the insured, claimant or their legal representative.
> g. Inter-Company Arbitration, Special Arbitration and other forms of Alternative Dispute Resolution (ADR) will be used in resolving disputes on appropriate cases.

(*Id*. at 38-39).  Again, Plaintiffs have presented substantial evidence that AMICO never did any of this.[13]

---

[13] Plaintiffs contend that during the course of this action (and even before its filing) AMICO has been unable to explain or justify its decision to deny coverage to CBC. AMICO's Rule 30(b)(6) deponent, Hawkins, was designated to testify about "claims-related topics":

Q. . . . Again, excluding everything that has been told to you by your

### 3. AMICO's Alleged Self-Interest

Plaintiffs also assert that AMICO's conduct in this case is the result of a self-interested motive.  AMICO is part of the "Lumbermens" company. (Doc. #159 at 39).  The company is in "commercial runoff." As one of AMICO's 30(b)(6) witnesses,  McGregor testified:

> A commercial runoff is a commercial alternative to a state-supervised rehabilitation or liquidation of an insurance company.  Lumbermens is no longer actively writing insurance. It hasn't written any new insurance since early 2003 and is simply in the process of running down and winding off its liabilities and other obligations which, as you can imagine with an insurance company, takes a very long time.

(*Id*.).  McGregor went on to explain that being engaged in "litigation" is the "main function" of AMICO:

> counsel, do you have any knowledge of any of the reasons your company takes the position there is no coverage in my client's case?
> A. I have no knowledge.

(Doc. # 160 at 15).  In response to a similar a interrogatory propounded by CDC, AMICO stated as follows:

> 8. Please describe in detail everything done to investigate Capstone's claim for coverage prior to denial.
> Answer: What denial?  What claim? See answers immediately proceeding.

(*Id*.). And in response to interrogatories from CBC, AMICO stated:

> 7. Please state with particularity each and every basis for the denial of the plaintiff's claim for insurance coverage.
> Response: AMICO does not agree that Plaintiff has made a "claim for coverage" or that there has been a denial to provide coverage.
>
> 8. Please describe in detail everything done to investigate the plaintiff's claim for coverage prior to the denial.
> Response: AMICO does not agree that there has been any "denial" of a "claim for coverage."

(*Id*. at 15-16).

36

> Q. All right. Obviously it's still engaged certain litigation, such as this case?
> A. Yes.
> Q. All right. What other functions does it have at this point in time?
> A. That is its main function.

(*Id*. at 40). McGregor stated that, as of August 2008, the AMICO workforce was down from a high of 11,000 employees to about 240 (this was in August 2008) and that the outcome of the runoff was "personal to him" and "it's likely the company's fate will end with a state-supervised or court ordered liquidation." (*Id*.). This would be triggered if and when, on paper, the company is insolvent, as "[l]iquidation is mandatory if a company's liabilities excess its assets. (*Id*.). If there were either a negative policyholder surplus or zero policyholder surplus, the company by statute has to be liquidated." (*Id*.). Also, McGregor acknowledged that the "more practical problem would be cash flow. (*Id*.). If, for example, the company didn't have enough current cash to meet its obligations, including payroll and the payment of claims and the like, that also would likely force the company into a liquidation." (*Id*.). For the past several years AMICO has "not [been] writing any more [policies] and [is] staying in existence to handle any claims out there." (*Id*. at 41). When the last claim is closed the company will cease to exist (unless before then the company will be placed in receivership). (*Id*.).

Plaintiffs contend that AMICO's "runoff" status creates a self-interested motive for AMICO to deny, delay, and litigate large claims like this one. (*Id*.). Plaintiffs contend that the trier of fact could draw the following inferences: the longer AMICO can delay payment of claims, the longer it can hold onto its cash; the longer it can hold onto its cash, the longer it gets to exist; and the longer it exists, the longer people like McGregor, Hawkins, and Micheletti get to keep their jobs. (*Id*.).

### 4.      Plaintiffs' Proffered Expert Testimony

Plaintiffs have retained an expert on insurance claim handling, local attorney Bert S. Nettles. (*Id*. at 41).   Mr. Nettles has spent more than 40 years defending insurance companies in coverage-related and "bad faith" actions.   (*Id*.).   Mr. Nettles' has proffered the following expert opinions to the court:

> A. It appears that AMICO intentionally or recklessly failed to investigate the claims of CBC and CDC, for reasons that would include the following:
>> • Apparently there was no meeting with, visits to, or statements or testimony taken from UCONN at any point;
>> • It does not appear that AMICO conducted any meaningful investigation or follow-through with respect to either UCONN's revised demand for mediation in December 2006, or UCONN's August 7, 2007 letter that went directly to AMICO;
>> • Despite requests AMICO refused to meet with CBC or CDC about mediation;
>> • AMICO refused to participate in mediation despite requests to do so;
>> • It appears Bill Lyles' letter of 05/09/05 requesting coverage of CDC was improperly treated as coming under an excess policy; and
>> • It appears there was no response to Bill Lyles' repeated requests for defense of CDC against UCONN's claims and UCONN's demand for mediation, until AMICO's May 31, 2006 filing of a declaratory judgment against CDC.
>
> B. It appears that AMICO failed to properly subject the claims of both CBC and CDC to a cognitive evaluation or review.
>
> C. It appears that post-mediation AMICO improperly manufactured or sought to manufacture a 'debatable reason' to continue in the denial of the claims of CBC and CDC, as demonstrated by (1) the letters of AMICO's counsel of 10-31-07 to CBC's counsel and 12-19-07 to CDC's counsel asserting that AMICO had concerns as to collusion between CBC and CDC with UCONN in regard to mediation; and (2) by repeated improper assertions as to the failure of CBC and CDC to cooperate with AMICO and/or AMICO's counsel.
>
> D. It appears that AMICO improperly relied upon an ambiguous portion of the insurance policy as a lawful basis for denying the

claims of CBC and CDC, as demonstrated by AMICO's contention that neither CBC nor CDC were insureds under the policy.

E. Notwithstanding an insurer's greater duty to defend than to indemnity, it appears AMICO improperly failed to provide CBC and CDC with a defense against the claims of UCONN.

F. It appears the conduct of AMICO was not simply bad judgment or negligence, but a breach of known duties, i.e., good faith and fair dealing, through some motive of self-interest or ill will.

(*Id*. at 41-43).

## III.    QUESTIONS TO BE CERTIFIED

The questions to be certified are fully set out in the court's order entered contemporaneously with this Memorandum Opinion.

**DONE** and **ORDERED** this _____22nd_____ day of September, 2011.

**R. DAVID PROCTOR**
UNITED STATES DISTRICT JUDGE